IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 13, 2013

## HARVEY TAYLOR v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1760     Monte Watkins, Judge**

_____

**No. M2012-01228-CCA-R3-PC - Filed February 21, 2013**

_____

The Petitioner, Harvey Taylor, pled guilty to rape, a Class B felony, and, pursuant to the plea agreement, the trial court sentenced him to twelve years in the Tennessee Department of Correction. The Petitioner timely filed a petition for post-conviction relief claiming that his guilty plea was not knowing and voluntary because he received the ineffective assistance of counsel. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Ashley Preston, Nashville, Tennessee for the appellant, Harvey Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Roger Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

**A. Guilty Plea Submission Hearing**

At the Petitioner's guilty plea submission hearing, the State provided the following factual basis for the Petitioner's guilty plea:

[O]n May the 4th, 2007 [the Petitioner] entered [the victim's] room and had vaginal-penile intercourse with her. The witnesses would [have] testified that [the victim], who is a patient at Madison Health Care and Rehabilitation Center, which is a nursing home in Davidson county, was seventy years old at [the] time, suffered from advanced condition of bipolar, diabetes, and a host of other ailments.

When Charlotte Boyd, on May the 5th, 2007 - - who is a certified nurse technician - - entered [the victim's] room to find out how she was doing and take her to get a shower[,] [the victim] was very upset. She began telling [the] nurse - - or, Certified Nurse Technician Boyd, again and again, that a large black man had entered her room last night and had had sex with her. At one point Ms. Boyd was continually asking her "What do you mean?' And the victim in the case used her hands to explain that this man had inserted his penis into her vagina. And she actually made hand gestures to convince Ms. Boyd that there was a problem.

Ms. Boyd, following the chain of command, reported the rape to Marcia Patterson. And as Marcia Patterson began to approach [the victim] to ask her about the incident [the victim] was frantically telling other CNTs, including Pamila Hatton, Diane Heddon, and Shawnta Brown, what had happened. At one point [the victim] was so upset that she poured water on the floor, [claiming] that her water just broke and that she needed someone to take her to the emergency room immediately because she was having a baby.

Finally, Linda Thompson who is the primary nurse of [the victim] was notified. And [the victim] . . . was taken into a room where Nurse Thompson began to ask her questions about what had happened last night. [The victim] reported over and over to Nurse Thompson that the man had come into her room, that he had put her legs over [his] shoulder, and that he had inserted his penis into her vagina.

At that point Detective Jason Terry with the Metropolitan Police Department was notified and met Linda Thompson and [the victim] at General Hospital. At General Hospital, Nurse Practitioner Beverly Byrum (ph.) would have testified that . . . she began doing a medical-legal exam. As part of the medical-legal exam she collected the victim's panties. She would have testified that she noted that there was blood in the crotch of [the victim's] panties. And during the medical-legal exam she noted bruising to the victim's inner thigh, a hematoma in the victim's vaginal wall, and small tears to all the

sides of her vaginal wall. There were several swabs that were collected. And all of these items were sent to the TBI for analysis.

Detective Terry spoke with the [Petitioner] several times. And, although the . . . [Petitioner] provided several different [ac]counts of the incident he denied repeatedly ever having sexual contact with the victim. . . . Detective Terry then provided the TBI with oral swabs from [the Petitioner]. And found in the crotch of [the victim's] underwear was semen. That semen matched the DNA profile of the [Petitioner].

At the plea submission hearing, the trial court reviewed the proposed sentence with the Petitioner. The Petitioner denied being under the influence of any drug or alcohol or suffering from a mental illness. The Petitioner affirmed that he was satisfied with his attorney's ("Counsel") representation. The trial court told the Petitioner that he was charged with aggravated rape, and the Petitioner agreed that the original charge and range of punishment had been explained to him. The trial court told the Petitioner that he was pleading guilty to the reduced charge of rape. The Petitioner agreed that he understood that this conviction could be used to enhance his punishment for any future felony offenses. The Petitioner stated that he understood his constitutional rights and the rights he waived by entering a guilty plea. The Petitioner than affirmed that he was willingly entering the plea agreement with the State. When asked if he understood the plea petition, the Petitioner responded, "Somewhat." Upon further discussion with the trial court, the Petitioner responded, "Yes. I understand it."

The Petitioner said he did not have any questions for Counsel or the trial court about his plea agreement with the State. The Petitioner stated that he "freely" signed the plea petition. Counsel then stated that she believed the Petitioner understood the plea agreement and was entering the plea agreement "freely and voluntarily." The Petitioner entered his plea of "guilty." The trial court found a factual basis to support the Petitioner's guilty plea and that the plea was "freely" and voluntarily given.

Pursuant to the plea agreement, the trial court sentenced the Petitioner to serve twelve years in the Tennessee Department of Correction.

**B. Post-Conviction Hearing**

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. The post-conviction court held a hearing, during which the parties presented the following evidence: The Petitioner testified that an attorney from

the Public Defender's Office represented him during this case. The Petitioner was charged with aggravated rape, but Counsel negotiated a plea offer with the State that allowed the Petitioner to plead guilty to the lesser charge of rape. The Petitioner recalled that, during Counsel's representation of approximately a year, she met with him "about four times" at the Criminal Justice Center where he was detained.

The Petitioner testified that Counsel never discussed the option of a trial. The only mention of a trial was when Counsel told the Petitioner that the State did not want to "take it to trial." The Petitioner said that Counsel never discussed potential defenses with him. The Petitioner said that "most of the time" Counsel told him there was "no offer at all." The week before the Petitioner's trial date, however, Counsel told the Petitioner that she had talked with the State's attorney and requested a plea offer.

The Petitioner testified that he entered a guilty plea five days before his trial date. He said that Counsel never reviewed the plea petition with him. Counsel instructed the Petitioner to sign a document telling him that, if he did not, he would go to jail for twenty-five or thirty years and then she broke down and cried. The Petitioner said that this "scared" him, so he signed the plea petition. After the Petitioner signed the paperwork, Counsel "jumped up" and left the room, leaving her investigator in the room with the Petitioner. The Petitioner said that he and the investigator "sat there and prayed, and then [the investigator] left." The Petitioner reiterated that he signed the plea petition because Counsel scared him.

The Petitioner testified that he told Counsel about potential witnesses to contact in defense of his case and that Counsel failed to do so. He believed that he would have proceeded to trial had he been fully informed of "everything," and the outcome would have been different. The Petitioner said that his defense at trial would have been that "the incident never happened." The Petitioner denied raping the victim and said that he was "just doing [his] job."

The Petitioner testified that Counsel did not inform him of his rights, explain the consequences of entering a guilty plea, or review the plea petition with him. The Petitioner said that Counsel had told him that the State's offer was a twelve-year sentence to be served at 85%. During the plea submission hearing, the trial court said that the sentence was to be served at 100%, which confused the Petitioner. The Petitioner explained that he proceeded with the guilty plea despite his confusion because he was "scared" and had "never been in this situation before."

The Petitioner testified that, because Counsel failed to render advice sufficient to allow him to make an informed decision about whether to plead guilty or proceed to trial, he believed that he had no choice but to enter a guilty plea. The Petitioner asked the post-

conviction court to set aside his guilty plea and allow him a trial in his case.

On cross-examination, the State asked the Petitioner how his semen got onto the victim's underwear. The Petitioner responded as follows:

> Like I told [Counsel], what it was, I was dating one of the girls - - I was messing with two or three different nurses on the thing. Me and her had been fore-playing. I went into the privacy of a bathroom, of the patient bathroom, and relieving myself. And like I said, the patient is known to take her clothes off. I picked up her clothes, wiped my hands on them, and put it in the clothes hamper. That's how it got in her.

The Petitioner explained the injuries to the victim's genitals as "self-inflicted" due to the victim's history with yeast infections.

Counsel testified that she was licensed to practice law in three states and practiced solely criminal law. Counsel recalled that she met with the Petitioner twice before the preliminary hearing and then conducted the hearing. Counsel said that the Petitioner's case had "some interesting legal issues." One of which was the fact that, due to the victim's medical condition, she would be unable to testify at trial. Thus, there were a number of issues dealing with the admissibility of out-of-court statements challenged on various theories. Counsel said that she consulted with a DNA expert on this case but was unable to find any basis upon which to attack the DNA evidence against the Petitioner.

Counsel testified that she reviewed her notes in preparation for her testimony at the post-conviction hearing and found that she had met with the Petitioner in jail on sixteen occasions after the case was indicted. Counsel said that she understood the Petitioner's version of how the injuries could have happened to the victim and believed that she could have made a case for it being consistent with what he told police. The semen in the victim's underwear was problematic, however, and the issue that she kept "coming back to over and over again."

Counsel testified that there was not an offer in the case for a long time because of the pre-trial motions related to out-of-court statements and the necessary review of medical records in the case. Counsel said her investigator met with "most" of the witnesses identified by the Petitioner, including some of the women with whom the Petitioner said he might have had consensual sexual contact. Based on the investigation, Counsel said she understood the Petitioner's case "very, very well."

Counsel testified that, two days before the plea submission hearing, Counsel went to

the jail twice to discuss the plea offer with the Petitioner in an effort to ensure that he understood the State's offer. In response to the question of whether she had reason to believe the Petitioner understood "what was going on," Counsel responded:

> I think, and in reviewing my notes, I think [the Petitioner] had some issues understanding what was going on, partly because of what he says: He had never been in trouble before. I think the whole thing was just a horrible shock to him. So it took him longer to understand things, and that's partly why I spent so much time with him. But he definitely understood what was going on by the time we were standing in front of the judge.

Counsel testified that she did not remember crying in the Petitioner's presence but that she advised the Petitioner that it was in his best interest to accept the State's plea offer.

On cross-examination, Counsel testified that she represented the Petitioner for about a year. Counsel said that she fully discussed the Petitioner's defenses with him and whether those defenses would be enough to overcome the detrimental DNA evidence. Counsel agreed that the Petitioner told her about a number of employees with whom the Petitioner said he had engaged in consensual sexual conduct. Counsel said that she spoke with two or three employees, who denied any sexual interaction with the Petitioner, and she was unable to locate one of the employees. Counsel testified that she reviewed the Petitioner's sentence with him and believed that he understood the sentence.

After the post-conviction hearing, the post-conviction court issued an order denying the Petitioner's petition for post-conviction relief, finding that the Petitioner had failed to establish that Counsel was ineffective in her representation of him. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that he received the ineffective assistance of counsel, warranting post-conviction relief. Specifically, he claims that Counsel did not adequately discuss his potential defenses with him. The Petitioner states that he felt "pushed into the plea agreement" due to Counsel's emotional breakdown during plea discussions and the threat that he would serve twenty-five or thirty years if he did not accept the State's offer. The State responds that the post-conviction court properly denied the post-conviction petition. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.

T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court

should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

In its order denying relief, the post-conviction court made the following findings:

> A close review of the record and testimony presented, reveals that [C]ounsel meet [sic] with the [Petitioner] and informed him of the nature of the charges against him, the likelihood of and range of punishment, and the nature and consequences of the plea agreement to the [P]etitioner.

-8-

Therefore, Petitioner has failed to demonstrate by clear and convincing evidence ineffective assistance of counsel and that the plea was a violation of due process rights in violation of a constitutional right to render his conviction and sentence void or voidable under the Post Conviction Relief Act. The Court does not find the [P]etitioner's testimony credible. Accordingly, the Court finds Petitioner has failed to show that he was prejudice[d] by [C]ounsel's allegedly deficient conduct.

The evidence in this case does not preponderate against the post-conviction court's findings. Our review of the record reveals that Counsel thoroughly investigated the Petitioner's potential defenses and communicated with the Petitioner about his case and its progress. Counsel filed multiple motions seeking to exclude detrimental testimony to the Petitioner's case based on recent changes in the law at the time. Counsel met with the Petitioner twice on the same day before the plea submission hearing to ensure that the Petitioner understood the plea petition and the consequences. Although the Petitioner testified that he was scared and felt forced into entering the guilty plea, the post-conviction court did not find his testimony credible. Furthermore, Counsel testified that, after many discussions with the Petitioner, she believed the Petitioner understood his sentence and the plea agreement at the time of the entry of his guilty plea. The record of the guilty plea submission hearing also reflects that the Petitioner understood the nature of his charges, guilty plea and punishment.

Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show by clear and convincing evidence that Counsel was deficient. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE